Moltz *v*. Dalrymple

5-3543                                      389 S. W. 2d 625

Opinion Delivered May 3, 1965.

*Carlton Currie,* for appellant.

*Coleman, Gantt, Ramsay & Cox,* for appellee.

Jim Johnson, Associate Justice. This is in essence a boundary line dispute. The parties involved are neighbors in Shady Grove Subdivision in Pine Bluff. Appellants J. E. and Joann Moltz own Lot 16 and appellee John B. Dalrymple owns Lot 17. Appellants filed a complaint in Jefferson Chancery Court on July 7, 1964, alleging that appellee built a house within ten feet of their common lot line in violation of the restrictive covenants of the subdivision, thus depreciating the value of appellants' property, and prayed an injunction requiring appellee to move his house so it would not "encroach upon the restricted area in which appellee is prohibited to build." (Appellants do not claim that appellee has encroached upon their lot.)

At trial on August 12, 1964, the chancellor found that appellants "failed to establish by a preponderance of the evidence that there has been a breach of the covenant involved to such an extent that the Court would be justified in granting the relief prayed for." For reversal of the decree, appellants urge that the evidence in the case clearly establishes that an encroachment exists.

The recorded bill of assurance for Shady Grove Subdivision contains certain restrictive covenants including one that states in part: "No building shall be erected

nearer than ten (10) feet to any side lot line." Appellants contend that appellee's house is less than ten feet from the side lot line. One of the appellants testified that he tied a string between two iron pins marking the boundary between Lots 16 and 17, measured the distance from the line to the foundation of appellee's house and found that one corner was only eight feet, nine or ten inches from the line and another corner was about nine and one-half feet from the lot line. Photographs were introduced showing appellants' measurements of the distance from appellee's house to the string which allegedly marked the lot line.

Two highly qualified registered professional engineers testified at trial, Walter Combs who had surveyed for appellants, and Leo Tyra for appellee.

Mr. Combs, an engineer since 1907, stated that when he made the survey of appellants' property for their construction loan in 1963, he had to "hunt all over the neighborhood to find something to work from." "I found one iron [pin] . . . at the southwest corner of Lot 16. That was the only iron I could find." He testified that the survey of Lot 16 was as accurate as he could make it, having nothing but one iron to work from. He said on cross-examination that the east corner could easily be ten or twelve inches off, but that the northwest corner was within "five or six inches of what you call the true corner." He said that working under the same set of conditions competent engineers might well differ, and that, under these conditions, "all you can do is pull from one corner and make them all fit together . . . like a cross-word puzzle . . . and don't get on the other fellow if you can help it." When asked if he was willing to state to the court the line which he established as the line of appellants' property is an absolute true and correct line, Mr. Combs repliedly candidly:

"I can't swear to it. It's the best I could get up there with the information I had to work with. Whether it's absolutely accurate or not, I wouldn't swear to it."

Leo Tyra, an engineer since 1954, surveyed Lot 17 for appellee in the spring of 1964 prior to appellee's con-

struction. He testified that he had examined the original subdivision plat in the recorder's office and found that plat was not tied into a government survey, but apparently was commenced from a center line of a street. Some of his testimony follows:

"We ran into a complication here, because there really is no starting point. We guess at the center line of 28th Street. This plat has numerous curves existing at the time it was laid out. It's a very complicated survey. The starting line or point, I assumed was, from my survey, in the center line of 28th Street, and come up along the railroad right of way to the back of the lots, other lots, in the same subdivision trying to tie in and find the original pins of the original survey, and at an appropriate time you make your cross-over as near as you can to the lot you are starting to survey. You search that lot for pins. You truly hope to have the original pins there . . . We set wooden stakes, set up over these stakes and turn the next necessary angle and make the measurements called for in the original plat, and then really search out for the original pins."

"I have been out there several times . . . I met with [appellant] one afternoon . . . and went through certain measurements where I showed him how we tried to relate this property to the property around it so no one was being encroached on as far as the property was concerned."

"The afternoon I was there . . . I tried to explain to [appellant] then and there that he was putting too much accuracy to the tail end of the survey . . . it would be similar to weighing in tons and all of a sudden . . . begin talking about pounds."

"Now, talking with [appellant] that night I met with him, I tried to explain to him. I went back and told him how you can't use these center lines of these existing streets to survey a lot in a plat because houses which have been built prevent you from making the curves that the data calls for in the plat. I explained to him that the inaccuracies in bringing such a survey from 28th Street would not let us draw a string between two pins we had finally set and say those two pins would be accurate between half

a foot and at the time I left him I though he understood that and realized those inaccuracies are inherent to a survey of this type.''

The trial court in its opinion discussed the testimony of both engineers and stated: ''Even though this is not a boundary line dispute, the true boundary line separating the two lots is material and from the evidence, the Court cannot definitely determine just where the true line is.''

A careful study of the testimony of the two engineers reveals that although they employed different methods their testimony was quite consistent. On trial de novo on the record before us, we are also unable to determine just where the true line is. It follows, therefore, that the finding of the chancellor is not against the weight of the evidence.

Affirmed.